UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:17-cv-22304-XXXX

PLENTIUM CAPITAL GROUP CORPORATION,

      Plaintiff,

vs.

RENWICK HADDOW,
ZOIA KYSELOVA,
FRANKLIN C. KINARD,
BAR WORKS, INC.,
BAR WORKS MANAGEMENT, INC.,
BARWORKS MIAMI, LLC, and
BAR WORKS CHAMBERS ST, INC.,

      Defendants.

_____/

**COMPLAINT**
**(with Demand for Trial by Jury)**

The plaintiff, PLENTIUM CAPITAL GROUP CORPORATION ("Plentium"), files this complaint against the defendants, RENWICK HADDOW, ZOIA KYSELOVA, FRANKLIN C. KINARD, BAR WORKS, INC. ("Bar Works"), BAR WORKS MANAGEMENT, INC. ("Bar Works Management"), BAR WORKS MIAMI, LLC ("Bar Works Miami"), and BAR WORKS CHAMBERS ST, INC. ("Bar Works Chambers Street"), alleging as follows:

**Introduction**

1.    This case involves securities fraud by the defendants against foreign and U.S. investors, including, without limitation, Plentium.

2.      The defendants claim to be part of a legitimate group of businesses in the shared workspace industry.[1]

3.      Haddow is a fraudster from the United Kingdom.  He has used corporate entities, including, without limitation, those named in this Complaint, to operate a Ponzi scheme. Haddow orchestrated the fraudulent scheme by misusing the entity defendants to solicit investments.  Plentium estimates there are between 250 and 1,000 investors who together invested not less than $25 million in Bar Works.  Kyselova and Kinard participated in the fraudulent scheme.

4.      The scheme worked as follows: Beginning in 2015, misleading prospectuses and a misleading website for which all of the defendants are responsible touted investments in Bar Works.  Bar Works purported to acquire locations around the country at which Bar Works created shared workspaces managed by its subsidiary and used by affiliates, including, without limitation, the Wynwood location used by Bar Works Miami and the Chambers Street location used by Bar Works Chambers Street.

5.      Investors, like Plentium, were guaranteed steady income, capital appreciation, and an efficient trading platform for investments in workspace units at the locations, which investments were solicited by Bar Works and sold through affiliates, such as Bar Works Miami and Bar Works Chambers Street.  Among other financial improprieties, the monies invested were commingled and misused.   In recent weeks, the Ponzi scheme began to unravel as guaranteed monthly payments to the investors were suspended indefinitely and investigative journalists revealed the deceit underlying Bar Works' leasing program/investment scheme.

---

[1] Regus and WeWork are some of the other providers in this industry.  Shared workspaces include co-working arrangements, executive suites, flexible office arrangements, and virtual offices, which are offered on both a short-term and long-term basis.

<u>**The Parties, Jurisdiction, and Venue**</u>

6.     Plentium is a Florida corporation located in Miami-Dade County, Florida.

7.     Haddow is a foreign national believed to be currently domiciled in New York City, New York.

8.     Kyselova is a foreign national believed to be currently domiciled in New York City, New York.

9.     Kinard is believed to be a resident of New Jersey.

10.     Bar Works is a Delaware corporation.

11.     Bar Works Management is a New York corporation.

12.     Bar Works Chambers Street is a Delaware limited liability company.

13.     Bar Works Miami is a Florida corporation.

14.     Each of the entity defendants (collectively, the "Bar Works Group") has been established, controlled, and/or operated by the individual defendants as part of a Ponzi scheme that perpetrated investment fraud in violation of federal securities laws upon a great number of investors, including, without limitation, Plentium.

15.     This Court has original jurisdiction over this action.  15 U.S.C. § 77v; 15 U.S.C. § 78aa; 28 U.S.C. § 1331.

16.     This Court has personal jurisdiction over the defendants who have violated the Securities Act of 1933 and the Securities Exchange Act of 1934.  These federal laws permit nationwide service of process upon defendants who maintain sufficient contacts with the United States as a whole.  Among other things, the defendants purposely sought to raise capital from investors located throughout the country, including, without limitation, investors within the State of Florida, such as, Plentium.  The defendants, all of whom are located in the United States,

routinely made use of the mails or other means or instrumentalities of interstate commerce, including, without limitation, electronic mail, to solicit and deliver investment contracts.

17.    In addition, if any further allegation is needed, all of the defendants have committed tortious acts or violations of federal securities statutes in this state, and the causes of action stated below arise from this conduct.  In addition, all of the defendants other than Bar Works Chambers Street have operated, conducted, engaged in, or carried on a business or business venture in this state through Bar Works Miami.  Further, Bar Works and Bar Works Management have owned, used, and possessed real property in this judicial district, and the causes of action stated below arise from this real property.

18.    Venue for this action is proper in this judicial district under the venue provision of the Securities Act of 1933 and the Securities Exchange Act of 1934 and Title 28 of the United States Code.  Among other things, much of the conduct that is the basis for this action was committed in this judicial district.

19.    Any conditions precedent to the imposition of liability upon the defendants and the assertion of claims by Plentium have been performed, have occurred, or have been waived. Alternatively, the defendants are estopped to raise any alleged condition precedent.

20.    Prior to filing this action, Plentium demanded rescission, offering to offset the investment income of $15,334.00 previously received by Plentium and to mark the investment contracts "cancelled" and return same to the defendants.  This demand was ignored, prompting Plentium to file this action.

## The Facts

**Haddow**

21.      Born in or about 1968, Haddow is a foreign national of disrepute who has a checkered past in the United Kingdom.  Two of the more unsavory aspects of his background include the following fraudulent schemes:

a.   On December 10, 2008, the Insolvency Service in the United Kingdom, pursuant to the United Kingdom's Company Directors Disqualification Act 1986, disqualified Haddow for eight years from serving as a company director in the United Kingdom based upon, among other things, his having made false and misleading statements about the financial condition of Branded Leisure, Plc, and his having failed to keep and preserve accounting records for this company.

b.   On February 14, 2014, in a lawsuit filed in London against Haddow and others by the Financial Conduct Authority (FCA),[2] Haddow was adjudicated by the High Court of Justice (Chancery Division) to have participated, notwithstanding his prior disqualification by the Insolvency Service, in the operation of an unregistered, and, therefore, illegal, "collective investment scheme" involving Capital Alternatives Limited and its affiliates (the "Capital Alternatives Scheme").  On March 25, 2015, this judgment was affirmed in the Court of Appeal (Civil Division).

c.   The Capital Alternatives Scheme is widely regarded as a Ponzi scheme operated by Haddow.   *E.g.*, Khadija Sharife, World Policy Institute, "Catch and Release," http://www.worldpolicy.org/journal/spring2015/catch-and-release   (Spring   2015)   (describing Capital Alternatives as "a classical Ponzi scheme—on a global basis.").

---

[2] The FCA is the United Kingdom's equivalent of the Securities and Exchange Commission ("SEC").

**Formation of the Bar Works Group**

22.     In or about 2014, Haddow entered the United States with his close associate, Kyselova, with whom Haddow shares an apartment in New York City.

23.     On or about July 24, 2015, Haddow and Kyselova founded Bar Works, causing this entity to incorporate in Delaware and to establish its headquarters in New York City.

24.     Haddow and Kyselova are the owners of Bar Works who control this entity.

25.     Haddow has been the chief executive officer and director of Bar Works, Kyselova also has been a director and operations executive of Bar Works, and Kinard has been an officer and director of Bar Works.

26.     On or about December 21, 2015, Haddow caused Bar Works Management to incorporate in New York and establish its headquarters in New York City in the apartment shared by him and Kyselova.

27.     Bar Works, as the parent corporation, controls Bar Works Management.

28.     In or about October 2015, Bar Works opened its first shared workspace location at 47 W. 39th Street, Manhattan.

29.     Since October 2015, Bar Works has created shared workspaces at other locations, including three more in Manhattan (Times Square, West Village, and Tribeca--on Chambers Street) and two more outside of New York City, including the Miami neighborhood known as Wynwood Miami and San Francisco.

30.     From 2015-17, Bar Works, according to its website, has raised money to open another eight locations, including three more locations in New York City (Eighth Avenue and Sixteenth Street, Tribeca on White Street, and the Williamsburg neighborhood of Brooklyn) and four other locations elsewhere in the United States, including one in Las Vegas and others in

Austin, Los Angeles, and Chicago.  In addition, Bar Works has planned to open locations offshore, including, without limitation, Istanbul, Turkey.

31.      In short, at the current time, Bar Works controls at least six shared workspace locations and has raised money to open other locations.

32.      Haddow formed other entities (the "Affiliates") for Bar Works' shared workspace locations (the "Locations"), including, without limitation, the two entities joined as defendants in this action, *i.e.*, Bar Works Miami and Bar Works Chambers Street.

33.      Haddow and Kyselova have owned or controlled the Affiliates, either directly or indirectly through Bar Works or through Kinard and/or other persons.

34.      According to a private placement memorandum issued in the name of Bar Works to the public in or about December 2015 to raise $1.5 million by selling stock and convertible notes, Bar Works described its business plan as one "focused on acquiring long-term leases to premises [with] . . . under-utilized space." Bar Works acquires the leasehold interest in the shared workspace location (the "Location") in its own name or controls the leasehold interest through an Affiliate.

**The Concealment of Haddow and Kyselova**

35.      From July 2015 through the present, so that the past transgressions of Haddow in the United Kingdom would not taint the public image of Bar Works, Haddow concealed his relationship to Bar Works.  During this same time period, Haddow and Kyselova concealed their close association and Kyselova's relationship to Bar Works.

36.      Haddow and Kyselova have gone to great lengths to suppress information about Haddow's past, making sure that neither of their names appear in the prospectuses of the Bar Works Group.

a.   For example, Haddow invented a director/officer for Bar Works supposedly by the name of "Jonathan Black," and went to the extraordinary length of creating a spurious LinkedIn™ profile for this fictitious person.  The inauthenticity of the LinkedIn™ page for Mr. Black was discovered by an internet journalist who compared Mr. Black's LinkedIn™ photo to that of one Frank Jones in Southlake Texas:



b.   According to Mr. Jones' profile, he was educated at the Sul Ross State University, in Alpine, Texas, whereas the LinkedIn™ page for Jonathan Black created by Haddow claims that he was educated at the Westminster Business School at the University of London in England.   After Mr. Black's doppelganger was spotted on the internet, Kinard assisted Haddow and Kyselova in their efforts to conceal their connections to the Bar Works Group.  Specifically, Kinard assumed the role of spokesperson for Bar Works and became its agent, signing prospectuses and contracts on behalf of the Bar Works Group.

    c.   By way of further example, photographic and video images of Kyselova appear in marketing materials for Bar Works, including, without limitation, prospectuses, yet Haddow and Kyselova, with the assistance of Kinard, have intentionally misidentified her as "Zoe Miller."



Photo: Buck Ennis
Bar Works was founded by Britons Zoe Miller, pictured, and Jonathan Black.

**The Investment Scheme**

    37.   According to a recently published statement of Kinard, the focus of the Bar Works Group, since Bar Works' inception, has been to sell investments.

    38.   The basic scheme was to attract as much investment capital as possible by selling as many ten-year subleases to "workspace units" at the various Locations.  Each investor was to make an investment in an amount not less than $25,000.00.  In return for this investment, a "workspace" unit at the Location was assigned to the investor.

39.     From inception, among other financial improprieties, Bar Works has commingled the investments solicited for each Affiliate/Location, misusing investments for reasons unrelated to the expenses of the Affiliates and unrelated to the Locations at which the investors received ten-year subleases.

**The Misleading Prospectuses that Omitted Facts**

40.     From inception, Bar Works used brochures or prospectuses to solicit investment contracts between the investing public and its Affiliates.

41.     The prospectuses were authored, approved, and/or reviewed by each of the individual defendants.  The prospectuses were signed by either Kinard or the fictitious person created by Haddow, *i.e.*, "Jonathan Black." Further, Kyselova misidentifies herself as "Zoe Miller" in the prospectuses.  All of the prospectuses were misleading in that they contained partial disclosures and omitted facts as alleged below.

42.     The prospectuses issued by Bar Works and its Affiliates and transmitted to potential investors by electronic mail contained the following statements, among others:

(a) The investors are guaranteed annual income between fourteen and sixteen percent of the principal amount of the investment from sub-subleases of the workspace units to third-party tenants;[3]

(b) The investors are guaranteed the right to share in future rent increases paid by the third-party tenants, yet the investors have no right or obligation to manage the workspaces unilaterally assigned to the investors; and

---

[3] According to the prospectuses, the annual return depends upon the number of workspace units acquired by the investor (14% for a single workstation unit, 15% for two units (referred to as the "Wealth Starter" program), 15.5% for three units (referred to as the "Wealth Accelerator" program), and 16% for five or more units (referred to as the "Wealth Builder" program).

11

(c) The investors are guaranteed the repayment of the entire principal amount of the investment by no later than the end of the ten-year sublease, with the possibility of an earlier termination with full repayment and twenty-five percent "appreciation" on the principal amount of the investment.

43.     None of these assertions in the prospectuses were presented as a projection or forecast.  Instead, assertions made about future performance were stated as guarantees.  The rent payments were described as "minimum" returns, the right to repayment of principal at the end of the sublease was absolute and promised without any qualification, and the appreciation to be paid to the investor in the event of an earlier repurchase was described as a "minimum" return on investment.

44.     None of these assertions in the prospectuses were accompanied by any meaningful cautionary statements or caveats of any kind.  Further, these assertions were made without the disclosure of any specific risks, or for that matter, any general boilerplate language or disclaimers.   In other words, none of the language in these prospectuses, if construed reasonably and in *pari materia*, bespeaks any caution with regard to these assertions.

45.     These assertions in the prospectuses were made without a reasonable basis and with the specific awareness of undermining facts, none of which were disclosed to investors, including, without limitation, that the Bar Works Group was commingling the investments, among other financial improprieties, and the Bar Works Group did not have sufficient cash flow to pay (a) the minimum annual returns guaranteed to the investors, (b) the expenses incurred to acquire leaseholds for the Locations, and (c) the expense of renovating the Locations.

46.     Haddow (from inception) and Kinard (since at least the last quarter of 2016), as the officers and/or directors of Bar Works who handled the financial affairs of the Bar Works Group on a daily basis, knew that the cash flow of the Bar Works Group was insufficient.

47.     In addition to these omissions about the unlikelihood of achieving the future performance guaranteed in the prospectuses, the prospectuses concealed other matters too.  For example, the prospectuses touted investments in the "lease scheme" by suggesting that Bar Works would offer a "matched bargain" or "matched trade" facility where investors could supposedly sell their workspace units at any time if they chose to do so.  In fact, Bar Works never made any meaningful effort to provide an efficient market for trading the workspace units, which were unregistered and for which there was never any prospect of registration.  Bar Works never disclosed all that would be required to create a trading facility, which information, if provided, would have revealed that the trading facility was merely an empty promise about a concept or plan that was likely, if not certain, to be unachievable in the foreseeable future, if ever.

48.     Haddow, who is currently operating a crowdfunding website, was the owner, officer, and director at Bar Works who oversaw all efforts to raise capital for the Bar Works Group.  Based upon his prior background in the United Kingdom, his capital raising activities in the United States, and his regular contact with advisors of Bar Works, Haddow knew that the representations and omissions about a trading facility in the prospectuses were misleading.

49.     In addition to misleading omissions about future performance of investments in workspace units and a trading facility to resell workspace units, the prospectuses issued by Bar Works were misleading based upon the following omissions, among others:

a.   The prospectuses omitted any mention of Haddow's connection to the Bar Works Group and omitted any disclosure about his past, including his disqualification in 2008 by the Insolvency Service due to the fraud he had committed at Premium Brands, Plc and the judgment in the High Court of Justice finding that he promoted the Capital Alternatives Scheme.

b.   The prospectuses omitted any mention of Kyselova's connection to either Haddow or the Bar Works Group.

c.   The prospectuses contained a "Letter from the Directors," yet the prospectuses concealed the identities of the directors.

d.   Notwithstanding these omissions that were intended to conceal the checkered past of Haddow in the United Kingdom, the prospectuses touted the plan of Bar Works to do business in the United Kingdom by refitting the famous red telephone boxes in various British cities as private offices for on-the-go workers.  The plan was dubious because of, among other things, Haddow's unsavory past in the United Kingdom.

50.   The individual defendants are well acquainted with each other, and each of them knew that the involvement of Haddow and Kyselova in the Bar Works Group was concealed and suppressed so as not to taint the public image of the Bar Works Group.  The individual defendants at all times realized that the public would not invest in any entity connected to the Bar Works Group if the connection between Haddow or his close associate, Kyselova, to the Bar Works Group was disclosed.

**The Investment Process**

51.   From inception, in order to invest, each investor was required to wire to Bar Works' bank account the entire principal amount of the investment, *i.e.*, $25,000.00 for each workspace unit, and to transmit by electronic mail to either Bar Works or Bar Works

Management an application for the investment, which application in no respect negated the assertions in the prospectuses or disclosed the misleading omissions.

52.     Thereafter, each investor was required to execute and return by electronic mail a ten-year lease (the "Lease") in which workspace unit(s) at the Location were assigned to the investor; and a ten-year sublease (the "Sublease") that guaranteed minimum rent to the investor between fourteen and sixteen percent, depending upon the amount invested, the right to fifty percent of rent increases charged to third-party tenants after the second anniversary of the Sublease, and return of the investment by no later than the end of the Sublease.

53.     The Affiliate in which an investment is made is typically denominated as the "Landlord" in the Lease, and Bar Works Management is typically denominated in the Sublease as the Sublease Holder, which entity alone has the right and obligation to manage the workspace units assigned to each investor.  Meanwhile, the investor is denominated as the "Lease Holder" in both the Lease and the Sublease without any right to manage the workspace units assigned to the investor.[4]

54.     Neither the Lease nor the Sublease negated in any respect the false assertions that were made in, nor disclosed in any respect the matters that were omitted from, the prospectuses. The Lease and the Sublease are multiple writings that incorporate each other and constitute a single investment contract.

55.     By this investment scheme, Bar Works has solicited millions of dollars in investments for each of the Locations.

---

[4] If the investment contract were a true real estate lease, one would expect the Affiliate to be named the "Lease Holder," the investor the "Sublease Holder," and Bar Works Management the "Sub-Sublease Holder."

56.     As of February 24, 2017, Bar Works had raised $22.83 million in capital through the sale of investments in workstation units.

**Last Quarter of 2016**

57.     It is now known that, in or about the last quarter of 2016, Bar Works employed Kinard to address "serious operational problems" in a "difficult restructuring" of the Bar Works Group.  Among other problems, Bar Works was having trouble with its "banking facilities," cash flow, and the completion of costly renovations.  As a result, Bar Works was in a "chaotic" state.

58.     As a result of the commingling, among other financial improprieties, the Bar Works Group was running out of cash flow to pay (a) the minimum income that had been promised to each investor, (b) the expenses of acquiring leaseholds for the Locations, and (c) the expense of renovating the Locations for the shared workspaces.

**Plentium's Investments in 2017**

59.     In or about February 2017, Plentium's president, Luca Pettinato, was introduced to Bar Works and the investment program for its lease scheme.

60.     Between February and April 2017, Plentium acquired twenty workspace units in the Bar Works Group, including investing $300,000.00 for twelve units in Bar Works Miami (February 2017) and $75,000.00 for three units in Bar Works Chambers Street (April 2017).  In addition, in March 2017, Plentium invested $125,000.00 to acquire five units in Bar Works Las Vegas, LLC.

61.     In fact, the entity, Bar Works Las Vegas, LLC (hereinafter "Bar Works Las Vegas") was never organized and is not a legal entity that actually exists, a fact that was never disclosed to Plentium.

62.     By a series of wires to the Bar Works' bank account, Plentium transferred the total sum of $500,000.00 to Bar Works for investments in Bar Works Miami, Bar Works Chambers Street, and Bar Works Las Vegas.

63.     Before Plentium invested in each location, Bar Works transmitted prospectuses to Pettinato for Bar Works Miami, Bar Works Las Vegas, and Bar Works Chambers Street.  These prospectuses contained the same statements and omissions described above in paragraphs 41 through 50.

64.     In addition, the brochure for Bar Works Las Vegas contains a form application that describes the entity in which the investment is being made in the non-existent entity, "Bar Works Las Vegas, LLC."

65.     In addition, none of these prospectuses disclosed anything about the "serious operational problems" or "difficult restructuring" described in paragraph 57 above.[5]

66.     Plentium executed three written applications, like those described in paragraph 51, for its investments in the lease scheme for Bar Works Miami, the non-existent entity, Bar Works Las Vegas, and Bar Works Chambers Street.

67.     Bar Works delivered a Lease and a Sublease for each of the investments made by Plentium in Bar Works Miami and Bar Works Las Vegas, the terms of which investment contracts have been described in paragraphs 52 through 54.

68.     The Leases and Subleases were executed by Plentium, as "Lease Holder," for its investment in Bar Works Miami and Bar Works Las Vegas.

69.     Bar Works Miami and Bar Works Las Vegas executed the Leases as "Landlord."

---

[5] The prospectuses provided to Plentium for its investment in Bar Works Miami and Bar Works Chambers Street both contained letters from the directors that were signed by only the fictional director, "Jonathan Black," whereas the prospectus provided to Plentium for its investment in "Bar Works Las Vegas" contained a letter from the directors that was signed only by Kinard.

70.     As "Sub-Lease Holder," Bar Works Management executed the Sublease for Plentium's investment in Bar Works Miami.  Contrary to the prospectus for Bar Works Las Vegas, the non-existent entity, Bar Works Las Vegas, instead of Bar Works Management, executed the Sublease for Plentium's investment in Bar Works Las Vegas.[6]

71.     Even though Plentium executed an application for its investment in Bar Works Chambers Street and wired the entire principal amount of the investment to Bar Works on or about April 26, 2017, neither a Lease nor Sublease has been provided to Plentium.

**The Ponzi Scheme Unravels**

72.     Beginning in or about April 2017, there were numerous defaults in the obligations owed to investors to make guaranteed monthly payments under the Subleases.

73.     On April 11, 2017, Bar Works, through Kinard, told investors that guaranteed minimum payments would be delayed, as it was necessary to send the rent payments in batches due to difficulties with "banking facilities" as the result of a "large and growing volume of banking transactions" and a "broad international client base" that had caused a "significant increase in banking costs." Kinard made no mention in April 2017 of the "serious operational issues" or "difficult restructuring" that he had been hired to handle and resolve in 2016.

74.     In May 2017, there was a breach of the obligation to make guaranteed monthly payments due to Plentium according to the prospectuses and/or Subleases it received.

75.     On May 11, 2017, Bar Works, through Kinard, next stated that the payment delays were actually the result of banks being "nervous about Bar Works making many

---

[6] For Plentium's investment in Bar Works Miami and Bar Works Las Vegas, Kinard, as "Global Managing Director" of Bar Works Miami and the non-existent entity, Bar Works Las Vegas, executed the Leases.  He executed the Sublease for Plentium's investment in Bar Works Miami as "Global Managing Director" of Bar Works Management.  Kinard executed the Sublease for Plentium's investment in Bar Works Las Vegas as "Global Managing Director" of the non-existent entity, Bar Works Las Vegas.  Kinard is personally liable under the Lease and Sublease for Plentium's investment in Bar Works Las Vegas, given this entity was never formed.

individual wire transfers around the world," and a determination that Bar Works' "liquidity was tied up."  Nonetheless, Kinard stated that guaranteed monthly payments would resume "shortly after[] June 1, 2017, when other Locations of Bar Works were scheduled to launch."

76.     Approximately two weeks later, Bar Works, through Kinard, admitted for the first time that he actually had been employed by Bar Works in 2016 to "execute a difficult restructuring" at Bar Works as a result of "serious operational problems," and that he was now "leaving the company," after having decided during the restructuring that unspecified Locations must be closed or abandoned with investors in these Locations to be transferred to other Locations that would continue to operate.

77.     Kinard further stated that the guaranteed monthly payments would resume according to a timetable that would be determined by unspecified managers of Bar Works.  In other words, through his resignation, Kinard, failed to disclose Haddow's and Kyselova's roles at Bar Works.

78.     Since April 2017, Plentium has not been advised of a transfer of its investment from the non-existent entity, Bar Works Las Vegas, to any other Affiliate or Location, nor has Plentium received any guaranteed monthly payments since April 2017 as provided for in the prospectuses or the Subleases that Plentium received.

79.     Based upon the foregoing, Plentium alleges that Bar Works Group is insolvent, that Plentium was duped into making investments into a fraudulent investment program, which, in reality, is another Ponzi scheme masterminded by Haddow, whose connection to the Bar Works Group was concealed by the individual defendants, and that Plentium stands to lose its entire investment of $500,000.00.

80.     Investigative reports on the internet specifically question whether the Bar Works Group is another Ponzi scheme.  *E.g.*, Chris Lang, Redd-Monitor, "Bar Works has been facing difficulties with its banking facilities, *etc.*, http://www.redd-monitor.org/2017/04/19/bar-works-has-been-facing-difficulties-with-its-banking-facilities-managing-director-franklin-kinard-tells-investors/ (April 19, 2017) (questioning whether Bar Works is a "Bomb-proof business model or Ponzi scheme").   There has been no response by any of the defendants to this or other investigative reports concerning Bar Works, Haddow, and Kyselova.

**Bar Works' Leasing Program is a Security or an Investment Contract under Federal Law**

81.     Each investment made by Plentium to participate in the Bar Works' leasing scheme qualifies as an investment contract or security under federal law.

82.     All of the prospectuses used by Bar Works refer to (a) the lump-sum payments to acquire subleases as "investments," and (b) the persons, such as, Plentium, who pay $25,000.00 for each workspace unit, as "investors."

83.     The Bar Works Group has routinely admitted in prospectuses and internet postings from 2015 through the present that the acquisition of workspace units in the leasing scheme is an "investment."

84.     Moreover, since inception through the date on which Plentium made its final investment, Bar Works stated on its website, without explanation or further disclosure, that Bar Works is "registered" with the United States.[7]

85.     Upon information and belief, Haddow, who holds himself out as a search engine optimization executive, is responsible for the content of the website.   Kinard, as the public

---

[7] In fact, neither Bar Works nor any of the entities comprising the Bar Works Group, including, without limitation, the defendants in this action, has ever filed a registration statement with the SEC or any comparable state agency, such as, for example, the Division of Securities in the Florida Office of Financial Regulation.

spokesperson for Bar Works since the last quarter of 2016 through May 2017, was also responsible for the content of the Bar Works' website at least during that time frame.

86.    Plentium, like other members of the public who wired funds to Bar Works, has invested substantial sums of money.

87.    The investments by Plentium and others were made in a common enterprise in that the fortunes of each of the investors, including, without limitation, Plentium, were interwoven with and dependent on the efforts and success of those seeking the investments or other third parties, including Bar Works, Bar Works Management, and/or Kinard.

88.    All of the investors, including, without limitation, Plentium, expected profits from the efforts of others in the sense that the investors were dependent upon the alleged entrepreneurial and management skills of other persons, including Bar Work, Bar Works Management, and/or Kinard, upon whom the investors had no reasonable alternative but to rely.

**Legal Basis for the Liability of Each Defendant**

89.    In the counts asserted below, Kinard, instead of the non-existent entity, Bar Works Las Vegas, as well as Bar Works Miami and Bar Works Chambers Street, are liable to Plentium as the sellers of the securities to Plentium.

90.    In the counts asserted below, Bar Works is liable to Plentium based upon its having solicited Plentium to purchase the unregistered securities and its acceptance of the funds that were wired by Plentium to purchase the securities.  In addition, Bar Works is liable based upon its control of Bar Works Management and the Affiliates, Bar Works Miami and Bar Works Chambers Street.

91.     In the counts asserted below, Bar Works Management, in the case of the investments by Plentium in Bar Works Miami and Bar Works Chambers Street, and Kinard, in the case of Bar Works Las Vegas, are liable based upon their direct participation in the sale of

Subleases to the plaintiff and their promises to pay minimum monthly income to the plaintiff and the obligation to repay the entire principal amount of the investments at the end of the term of the Subleases that were executed or to be executed in connection with Plentium's investments. In addition, Bar Works and Bar Works Management controlled the Locations of Bar Works Miami and Bar Works Chambers Street, and, upon information and belief, Bar Works, Bar Works Management, and/or Kinard controlled the Location of the non-existent entity, Bar Works Las Vegas.

92.     In the counts asserted below, the individual defendants are liable based upon their being persons who controlled, directly or indirectly, the Bar Works Group.  At all times material hereto, the individual defendants were directors, officers, and/or direct/beneficial owners of Bar Works and Bar Works Management, and Kinard was the person in control of the other entities that comprise the Bar Works Group.   Each of the individual defendants have executed documents in which they have identified themselves as officers or directors of Bar Works, which entity has been described in the prospectuses, marketing materials, and on the Bar Works' website as the sponsor of the leasing/investment scheme, the parent corporation of Bar Works Management, and in control of the Locations and the Affiliates, Bar Works Miami, Bar Works Chambers, and the non-existent entity, Bar Works Las Vegas.

93.     Further, Haddow signed or caused to be signed prospectuses, Leases and Subleases with the fictitious name, "Jonathan Black," including, without limitation, prospectuses that were furnished to Plentium for its investments in Bar Works Miami and Bar Works Chambers Street.   Kinard signed prospectuses, Leases, and Subleases, including, without limitation, the prospectus provided to Plentium for its investment in Bar Works Las Vegas, and

the Leases and Subleases that were provided to Plentium for its investments in Bar Works Miami and the non-existent entity, Bar Works Las Vegas.

**Losses Sustained by Plentium**

94.     As a result of the investment by Plentium in Bar Works Miami, Plentium has lost the consideration paid less the monthly payments received, *i.e.*, the total sum of $288,000.00. All of the defendants, with the exception of Bar Works Chambers Street, are jointly and severally liable to Plentium for this loss.

95.     As a result of the investment by Plentium in Bar Works Las Vegas, Plentium has lost the consideration paid less the monthly payments received, *i.e.*, the total sum of $121,666.00.  All of the defendants, with the exception of Bar Works Miami and Bar Works Chambers Street, are jointly and severally liable to Plentium for this loss.

96.     As a result of the investment by Plentium in Bar Works Chambers Street, Plentium has lost the consideration paid, *i.e.*, the sum of $75,000.00.  All of the defendants, with the exception of Bar Works Miami, are jointly and severally liable to Plentium for this loss.

**Count One for Sale of Unregistered Securities**
**(Violation of Section 12(a)(1) of the Securities Act of 1933)**

97.     The plaintiff re-alleges and hereby incorporates the allegations made in paragraphs 1 through 96.

98.     This cause of action is asserted against all of the defendants.

99.     The plaintiff has purchased unregistered securities.

100.     Each investment purchased by the plaintiff constitutes a "security" under federal law.  15 U.S.C. § 78c(a)(10).

101.    In violation of the Securities Act of 1933, 15 U.S.C. § 77e, when the securities were offered for sale and sold to the plaintiff, none of the securities was registered with the SEC, 15 U.S.C. § 77f.

102.    All of the offers to sell and sales that are the subject of this action involved the use of the mails or other means or instrumentalities of interstate commerce.

103.    The defendants are strictly liable to the plaintiff for the refund of all consideration paid by the plaintiff to purchase these unregistered securities. 15 U.S.C. § 77l(a)(1).[8]

104.    Based upon the foregoing, all of the defendants, with the exception of Bar Works Chambers Street, are jointly and severally liable to the plaintiff for the consideration paid to invest in Bar Works Miami, less the monthly payments received, *i.e.*, the sum of $288,000.00, based upon the plaintiff's purchase of an unregistered security from Bar Works Miami.

105.    Based upon the foregoing, all of the defendants, with the exception of Bar Works Miami and Bar Works Chambers Street, are jointly and severally liable to the plaintiff for the consideration paid to invest in Bar Works Las Vegas, less the monthly payments received, *i.e.*, the sum of $121,666.00, based upon the plaintiff's purchase of an unregistered security from the non-existent entity, Bar Works Las Vegas.

106.    Based upon the foregoing, all of the defendants, with the exception of Bar Works Miami, are jointly and severally liable to the plaintiff for the sum of $75,000.00 invested in Bar Works Chambers Street based upon the plaintiff's acceptance of an offer to purchase an unregistered security from Bar Works Chambers Street.

---

[8] The plaintiff acknowledges that the defendants may offset the guaranteed monthly payments in the amount of $12,000.00 under the Sublease for Bar Works Miami and $3,334.00 under the Sublease for Bar Works Las Vegas.

**Count Two for Misleading Omissions in Prospectuses**
**(Violation of Section 12(a)(2) of the Securities Act of 1933)**

107.   The plaintiff re-alleges and hereby incorporates the allegations made in paragraphs 1 through 96.

108.   This cause of action is asserted against all of the defendants.

109.   The plaintiff is the actual purchaser of securities.

110.   All of the offers to sell securities and sales of securities to the plaintiff involved the use of the mails or other means or instrumentalities of interstate commerce.

111.   Before the plaintiff purchased any of the unregistered securities, the prospectuses were issued in connection with the public offerings of the securities.

112.   All of these prospectuses were misleading because they contained omissions about (a) the cash flow of the Bar Works Group, (b) the commingling of investments in the Bar Works Group, (c) the unlikelihood that a trading facility would ever be established and operated to create an efficient market for the workspace units, (d) the substantial connection between the Bar Works Group and Haddow, a bad actor disqualified in the United Kingdom to serve as a director, who also was adjudicated to be the promoter of illegal investments in a Ponzi scheme, (d) the non-existence of "Jonathan Black," a fictitious person created to conceal the involvement of Haddow, (e) the substantial connection between the Bar Works Group and Haddow's close associate, Kyselova, who was intentionally misidentified; and (f) the non-existence of Bar Works Las Vegas as a legal entity.

113.   Each omission in the prospectuses was material in that any reasonable investor would have considered each of these omitted matters to be important information about a start-up enterprise, and any reasonable investor would have wanted to take the omitted matter into account before deciding to invest many thousands of dollars to purchase these securities.  Stated

another way, each of the omitted matters would have significantly altered the total mix of information available to a potential investor, such as the plaintiff, to whom cautionary statements were not furnished before investing.

114.   Before the plaintiff purchased these securities, the plaintiff was furnished with the prospectuses.

115.   Prior to the investments by the plaintiff, there was no disclosure of any of the material facts omitted from the prospectuses.

116.   The plaintiff relied upon the material omissions to purchase the securities.  The plaintiff would not have purchased any of the securities but for the material omissions.

117.   With respect to one or more of the omitted matters, none of the individual defendants can meet his or her burden to prove that he or she did not know that the matter(s) had been concealed in the prospectuses.

118.   The knowledge of the individual defendants, each of whom was an owner, officer, and/or director of Bar Works, Bar Works Management, and/or the Affiliates, Bar Works Miami or Bar Works Chamber Street, is legally imputed to all of the entities named as defendants in this action.

119.   The defendants are liable to the plaintiff for all losses causally related to the material omissions.

### Count Three for Misleading Omissions
**(Violation of Section 10(b) of the Securities Act of 1934 and SEC Rule 10b-5)**

120.   The plaintiff re-alleges and hereby incorporates the allegations made in paragraphs 1 through 96.

121.   This cause of action is asserted against all of the defendants.

122.   The plaintiff is the actual purchaser of securities.

123.    All of the offers to sell securities and sales of securities to the plaintiff involved the use of the mails or other means or instrumentalities of interstate commerce.

124.    Since Bar Works' inception in 2015 and through the date on which Plentium made its final investment in April 2017, Bar Works, on its website, stated that Bar Works is registered with the United States.   The meaning of this misleading statement has not been explained, nor has there been any disclosure that none of the Bar Works Group and none of their securities has been registered with the SEC or with any comparable state agency.

125.    At all times, based upon this misleading statement on the website, there existed a duty to disclose that none of the Bar Works Group had registered securities with the SEC or with any comparable state agency.

126.    This omission was material in that any reasonable investor would have considered the omitted matter to be important information about Bar Works, and any reasonable investor would have wanted to take the matter into account before deciding to invest many thousands of dollars to purchase these securities, which, in fact, were unregistered.   Stated another way, the omitted matter would have significantly altered the total mix of information available to potential investors, such as the plaintiff, to whom no explanation was ever provided regarding the meaning of the statement on the website that Bar Works was "registered" with the United States.

127.    Based upon the misleading statements in the prospectuses, *see* paragraphs 112 through 113, there was a duty at all times on the part of the defendants to disclose material matters that were omitted from the prospectuses.

128.    Before the plaintiff purchased each of the securities, the plaintiff was directed to the website and was furnished with the prospectus applicable to the investment.

129.   Prior to each investment by the plaintiff, there was no disclosure of any of the material facts omitted from the prospectus or the website.

130.   The plaintiff relied upon the material omissions to purchase each of the securities. The plaintiff would not have purchased any of the securities but for the material omissions.

131.   The material omissions are related to the losses that the plaintiffs has suffered, which losses are causally related to the material omissions.   Based upon the existence of the material matters that were omitted from the prospectuses and the website, the securities are valueless.   Since the material matters omitted have come to light, guaranteed payments were delayed, then suspended indefinitely; Kinard has resigned; and, on May 25, 2017, the website of Bar Works was rendered inaccessible on the internet and it was covered by a banner that read "Closed for Investment."

132.   The plaintiff's purchase of the securities was the result of deception and fraudulent concealment of material matters, and there was at all times an intent to deceive, manipulate, or defraud on the part of the defendants.

133.   The individual defendants had knowledge of one or more of the omitted matters as alleged above.   Alternatively, each of the individual defendants was severely reckless in his or her decision not to disclose the omitted matters.

134.   The knowledge of the individual defendants, each of whom was an owner, officer, and/or director of Bar Works, Bar Works Management, and/or the Affiliates, Bar Works Miami or Bar Works Chamber Street, is legally imputed to all of the entities named as defendants in this action.

**PRAYER FOR RELIEF**

WHEREFORE, the plaintiff, Plentium Capital Group Corporation, requests the entry of a judgment in the amount of $484,666.00 (the "Judgment Amount"), together with costs and

interest.  The defendants, Renwick Haddow, Zoia Kyselova, Franklin C. Kinard, Bar Works, Inc., and Bar Works Management, Inc. should be adjudicated as liable, jointly and severally, for the entire Judgment Amount of $484,666.00 and all costs and interest awarded to the plaintiff. Bar Works Miami, LLC should be adjudicated as liable, jointly and severally, for $288,000.00 of the Judgment Amount and all costs and interest awarded to the plaintiff.  Bar Works Chambers St, LLC should be adjudicated as liable, jointly and severally, for $75,000.00 of the Judgment Amount and all costs and interest awarded to the plaintiff.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the plaintiff demands a jury trial on all claims and issues triable by right to a jury.

Dated this 21st day of June, 2017.


Respectfully submitted,

*Attorneys for the Plaintiff, Plentium Capital Group Corporation*

BENNETT AIELLO
The Ingraham Building, Eighth Floor
25 Southeast Second Avenue
Miami, Florida  33131-1603
Phone: (305) 358-9011
Fax: (305) 358-9031

By:___ s/ Paul Aiello_____
         Paul Aiello, FBN 0909033
         Jeremy R. Kreines, FBN 101119